# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KIM WEHRENBERG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 06 C 487 |
| | ) |
| FEDERAL SIGNAL CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Kim Wehrenberg has sued Federal Signal Corporation for breach of a contract that governed the winding up of his employment as Federal Signal's general counsel. Wehrenberg claims that, while arranging to disburse funds held for him in a retirement plan in the form of Federal Signal common stock, Federal Signal gave him material, nonpublic information about a forthcoming earnings report that would negatively affect the company's stock price. Wehrenberg alleges that this put him at risk of liability for insider trading under the federal securities laws—had he sold the stock any time before the release of Federal Signal's earnings report and the attendant drop in its stock price. As a result, he says, Federal Signal denied him "full access" to the funds as the contract required. Federal Signal has moved for summary judgment on Wehrenberg's breach of contract claim. For the reasons set forth below, the Court denies Federal Signal's motion.

## BACKGROUND

Wehrenberg worked for Federal Signal as its general counsel, vice president, and corporate secretary. In February 2004, Federal Signal informed him that his

employment would be terminated. Shortly thereafter, Wehrenberg and Federal Signal entered into a contract (the "Separation Agreement") that governed the last phase of Wehrenberg's employment with the company. The agreement also set out certain rights and obligations of the parties after Wehrenberg's employment there ended. The Separation Agreement is at the heart of what remains of the parties' dispute.[1]

Under the agreement, Wehrenberg resigned effective March 1, 2004 but continued to be employed by Federal Signal in a non-executive, "of counsel" role for six months. During this period, Wehrenberg received his regular salary and was obligated, among other things, to help provide a smooth transition for his successor. Federal Signal and Wehrenberg agreed that at the end of these six months—a date that the parties' agreement made the "Separation Date"—he would make himself available to assist with litigation and other matters "whenever needed," for which he would be compensated at an hourly rate of $360. Pl. Add'l Facts, Ex. A at 2.

The agreement also provided that "as of the Separation Date, [Wehrenberg] shall have full access to funds which are held on his behalf under a Federal Signal Corporation Rabbi Trust." *Id.* at 3. The "Rabbi Trust" was a retirement savings plan for top-level Federal Signal executives; its holdings consisted of Federal Signal common stock. The parties agree that 168,406 shares of Federal Signal stock were held in Wehrenberg's name by the plan.

Twice during the month of September 2004, Wehrenberg requested that the funds in the Rabbi Trust be distributed to him. Upon making a third request on October 5, 2004, he was given a withdrawal form. Wehrenberg submitted the completed form

---

[1] Earlier versions of Wehrenberg's complaint alleged, among other things, violations of the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B), by both Federal Signal and the Federal Signal Corporation Supplemental Savings and Investment Plan. In August 2007, the Court granted Wehrenberg's motion for leave to file a second amended complaint dropping the ERISA claim, terminating the plan as a defendant, and alleging only the breach of contract now at issue. *Wehrenberg v. Federal Signal Corp.*, Case No. 06 C 487, Order of Aug. 22, 2007.

the next day, asking Federal Signal to give him the value of the shares in cash at the previous day's closing price on the New York Stock Exchange, which was $19.10. On October 8, 2004, Paul Wittig, a Federal Signal employee, told Wehrenberg in an e-mail that the company had received his request and that it was referring the matter to outside counsel for review "[g]iven the nature and timing of the request." Def. Statement of Facts ¶ 12. Later that day, David F. Morris, an attorney for Federal Signal employed by Thompson Coburn LLP, sent Wehrenberg a letter via e-mail in which he told Wehrenberg that

> [d]ue to the number of shares involved and your request to receive your proceeds in one distribution, Federal Signal is not able to honor your request to liquidate the shares on your behalf. Your request is further complicated by timing considerations related to your request, including considerations related to the Federal securities laws.

*Id.*, Ex. K at 1. Morris's letter went on to explain that Federal Signal would instead transfer to Wehrenberg the shares held on his behalf, minus a portion of the shares needed to satisfy tax withholding requirements.

Morris's letter closed with an invitation for Wehrenberg to call him with any questions. Wehrenberg called Morris the same day. According to Wehrenberg's notes from their conversation, Wehrenberg asked Morris to identify the securities law issue his request raised, in response to which Morris told him that Federal Signal was about to report earnings for the most recent quarter and that they would be material. According to Wehrenberg's notes, Morris then told him that Wehrenberg would bear the risk of any fluctuation in the stock's price once he took the shares.

In his complaint, Wehrenberg alleges that by the date of his exchanges with Morris and Wittig, "Federal knew that its third quarter operating results would be far worse than the expectation." 2d Am. Compl. ¶ 19. Thus, "timing," as Wittig and Morris used the term, referred to a likely drop in the price of Federal Signal's common stock

3

that would follow release of earnings report.  Wehrenberg alleges he understood this from his exchanges with Wittig and Morris and realized immediately that he could not sell his stock until the earnings report was released without risking liability for insider trading.

On October 26, 2004, Federal Signal reported a loss of $.05 per share for the third quarter, a result that fell below analysts' expectations.  Federal Signal's stock price dropped accordingly.  Shortly after the earnings report was made public, Federal Signal distributed 121,253 shares to Wehrenberg; it withheld the remaining 47,153 shares for tax purposes.  Wehrenberg directed his broker to sell the shares he had received, which the broker did at a price of $16.71 per share.  After fees and commissions, Wehrenberg received $2,021,152.30 for the shares.  Measured against the value of his shares at the October 5, 2004 stock price of $19.10, and after adjusting for the shares withheld by Federal Signal for tax purposes, Wehrenberg claims that this losses are $401,330.89.  2d Am. Compl. ¶ 27.

Wehrenberg now alleges that Federal Signal breached its contractual obligation to provide him "full access" to the funds held by the retirement plan because the company, through its agents Wittig and Morris, "burden[ed] access to those funds with a substantial risk [of] prosecution" for insider trading under the federal securities laws— that is, until after Federal Signal had reported its poor earnings and its stock price had fallen.  Pl. Mem. at 7; *see also* 2d Am. Compl. ¶ 25.

Federal Signal has moved the Court to grant summary judgment in its favor.

**DISCUSSION**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c). For purposes of the motion, the Court reads the evidentiary record in the light most favorable to the non-movant and draws all reasonable inferences in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002).

I. **Basis for possible insider-trading liability**

The first ground on which Federal Signal argues it is entitled to summary judgment concerns the basis on which Wehrenberg might have been subject to prosecution for insider trading under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

Federal Signal contends that in October 2004, Wehrenberg was neither a Federal Signal insider nor a tippee—that is, an outsider to whom an insider has conveyed material, nonpublic corporate information in breach of the insider's fiduciary duties to the corporation's shareholders, *see Dirks v. SEC*, 463 U.S. 646 (1983)—and thus could not have been prosecuted for insider trading had he sold Federal Signal stock before the earnings report's release. Wehrenberg counters that he was still a Federal Signal insider at the time of his exchanges with Wittig and Morris. Specifically, Wehrenberg argues that he only got the information he was given about Federal Signal's earnings report because he had "not yet completely unwound his . . . relationship with Federal as one of its top officers." Pl. Mem. at 12. Wehrenberg also points to his continuing obligation to provide legal services to Federal Signal after September 1, 2004 to suggest that he owed the company a fiduciary duty under an attorney-client relationship and could thus be considered an insider who might be exposed to insider-trading liability.

5

As an initial matter, the Court notes that the parties appear to agree on Wehrenberg's interpretation of the contract provision at issue here: anything that placed Wehrenberg under a "reasonable apprehension [of] prosecution or liability" for insider trading would deny him "full access" to the funds at issue in violation of the parties' agreement. Pl. Mem. at 6. Federal Signal says almost nothing on this point. In its reply brief, it asserts that Wehrenberg could have "insulated him[self] of [sic] any insider trading liability that he may have had" by disclosing to Federal Signal his intention to trade on the information given to him by Wittig and Morris, and thus "clearly had full access to his funds." Def. Reply at 10. In the absence of any argument by Federal Signal squarely on point, the Court reads this statement as an acceptance, at least for present purposes, of Wehrenberg's theory of how the parties' contract could be breached under the facts of this case.

Next, the Court notes that tippee analysis has no bearing on this case, despite the considerable space the parties devote to it in their briefs. Wehrenberg does not point to any breach of fiduciary duty to Federal Signal's shareholders by Wittig or Morris[2]

---

[2] Morris could be deemed a quasi-insider because it appears he knew in early October 2004 that Federal Signal was about to report earnings that fell below the market's expectations—information that potentially was material and certainly was nonpublic. The Supreme Court noted in *Dirks* that

> Under certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant . . . these outsiders may become fiduciaries of the shareholders. . . . [T]hey have entered into a special confidential relationship in the conduct of the business . . . and are given access to information solely for corporate purposes. . . . For such a duty to be imposed, however, the corporation must expect the outsider to keep the disclosed nonpublic information confidential, and the relationship must at least imply such a duty.

463 U.S. at 655 n.14; *United States v. O'Hagan*, 521 U.S. 642, 652 (1997) ("attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation" may be liable for insider trading); *Simon DeBartolo Group, LP v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 172 (2d Cir. 1999).

Federal Signal suggests that Wehrenberg, whose role after the separation date was to provide legal services when required, could at most have been a temporary insider of this sort—but was not even that because he received the information from Morris "solely for the purposes of finalizing the administration of [Federal Signal's] separation with [Wehrenberg], not to advance

that would allow imposition of derivative, tippee liability.  *See Dirks*, 463 U.S. at 660.  Rather, the Court's inquiry turns on Wehrenberg's status vis-à-vis Federal Signal in October 2004.

The Court concludes that a genuine issue of material fact exists as to whether Wehrenberg was a Federal Signal insider at the time of his exchanges with Wittig and Morris.  First, there is no question that Wehrenberg was an insider before March 1, 2004, given his role as Federal Signal's general counsel.  Second, the potential that he might still have been considered an insider for purposes of the securities laws appears to have motivated Federal Signal's cautionary statement that Wehrenberg's request was "further complicated by timing considerations" and Morris's reference to a forthcoming, material earnings report during his phone conversation with Wehrenberg.  For his part, Wittig testified that he had questions about Wehrenberg's status at the time of the request:

> My understanding is from roughly quarter end until when earnings are released, insiders cannot transact in stock. . . . One of the questions was, was Kim still considered an insider?  Given the role that he was even on that interim basis, I didn't know his official position.

Pl. Add'l Facts, Ex. F at 48.  Elsewhere in his testimony, Wittig again made it clear that Wehrenberg's comparatively recent departure from Federal Signal raised questions about whether he was still an insider:

> [I]t wasn't clear to me whether Kim was an insider when made his request because of his recent disputes with the company.  It wasn't clear to me that.  It was clear to me that Dick Gibb[, another former Federal Signal executive,] was not an insider because he had been gone a couple years at that time.

*Id.* at 65.

In short, the possibility that Wehrenberg might still be an insider subject to liability for insider trading if he sold Federal Signal stock was an impetus for the company's

---

any on-going corporate business."  Def. Reply at 3.  As the Court notes below, the argument that Wehrenberg could only have been a temporary insider misses the point.

decision to refer the request to its outside securities-law counsel and for counsel's alleged warning to Wehrenberg in explicit terms about a forthcoming, material earnings report.

Seen in this light, Federal Signal's arguments that Wehrenberg was no longer an insider in October 2004 fall short of establishing that no genuine fact dispute exists on this point. First, the possession of any particular piece fo information does not, as Federal Signal argues in its reply brief, determine insider status. Insider trading liability depends in the first instance on the existence of a "relationship of trust and confidence" between the defendant and the shareholders of the corporation whose shares are traded. *Chiarella v. United States*, 445 U.S. 22, 229 (1980). To be sure, trading on the basis of material, nonpublic information by insiders in violation of that trust is a necessary element of the offense. It is, however, the relationship of trust and confidence that makes a defendant who has traded on this information an insider.

Second, the Court is unpersuaded by Federal Signal's argument that, when he made his request, Wehrenberg could have been, at most, a "temporary" insider in the manner contemplated by the Supreme Court in footnote 14 of the Dirks decision—but was not because Federal Signal only conveyed the information to him to finalize his exit from the company and not to advance any "on-going corporate business." Def. Reply at 3. This argument has little merit. Quasi- or temporary insider status, per *Dirks*, requires that the lawyer, accountant, or other outsider (1) be in a "special confidential relationship in the conduct of the business"—i.e., one that at least implies a duty to maintain confidences—that (2) gives him access to nonpublic information "solely for corporate purposes" that (3) the corporation expects him to keep confidential. *Dirks*, 463 U. S. at 654 n.14. Contrary to Federal Signal's argument, the Court takes the view that severing a relationship with a former general counsel, and in the process disbursing benefits in the form of shares or the proceeds therefrom, is likely a corporate purpose that satisfies

the second element of temporary insider status. Wehrenberg's "of counsel" role, which had ended only weeks before he made his request, and his continued legal relationship with Federal Signal, combined with Morris's alleged willingness to disclose inside information to him, suggests that he had, at a minimum, temporary or quasi-insider status.

In sum, because a fact question exists as to Wehrenberg's insider status in October 2004, Federal Signal is not entitled to summary judgment on the ground that Wehrenberg would not, as a matter of law, have been at risk of prosecution for insider trading.

## II.     Materiality of information conveyed to Wehrenberg

Federal Signal next argues that it is entitled to summary judgment because the information conveyed to Wehrenberg does not meet the securities-law definition of materiality. Federal Signal asserts that Wehrenberg was not at risk of liability for insider trading under section 10(b) of the 1934 Act and Rule 10b-5 because he was never in possession of material, nonpublic information.

The thrust of Federal Signal's argument is that Wittig and Morris's "neutral statements" to Wehrenberg were not material because they "did not suggest the probability of any material event occurring." Def. Mem. at 6, 9. Federal Signal lists an array of business, legal, and financial events that are typically considered material—e.g., projections of financial results, proposed mergers, dispositions of major assets, impending defaults on corporate indebtedness, and major regulatory (non-)approvals—and points to Wehrenberg's testimony that neither Wittig nor Morris informed him of any such event. Because none of these events was the focus of Wittig or Morris's communications with Wehrenberg, Federal Signal argues, their statements could not have conveyed material information.

Wehrenberg counters that the statements conveyed enough information that he understood he risked liability if he sold Federal Signal stock before the release of the earnings report. Wehrenberg emphasizes that Morris, in his e-mail and follow-up phone conversation, said that the securities law issue raised by Wehrenberg's request involved Federal Signal's forthcoming earnings report, the report would be material, and Wehrenberg would bear the risk of fluctuations in the price of the stock he would receive. Wehrenberg argues that a reasonable jury could find that, together, these statements informed him that worse-than-expected earnings were about to drive down Federal Signal's stock price. Wehrenberg says he recognized that because he knew this information, he could not trade without exposing himself to liability for insider trading.

The Court concludes that Federal Signal is not entitled to summary judgment on the ground that Morris and Wittig's statements to Wehrenberg were immaterial as a matter of law. To begin with, summary judgment is appropriate on the issue of materiality only if the information in question is "so obviously important or so obviously unimportant to an investor, that reasonable minds cannot differ on the question." *Endo v. Albertine*, 863 F. Supp. 708, 717 (N.D. Ill. 1994); *see also Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 370 (7th Cir. 1997) (citing *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)); *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) (quoting *In re Apple Computer Secs. Litig.*, 886 F2d 1109, 1113 (9th Cir. 1989)) (determination of materiality in securities fraud cases "should ordinarily be left to the trier of fact"); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (citing *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

The Court is not persuaded that Morris's statement on the phone about a forthcoming, material earnings report, coupled with his caveat that Wehrenberg would bear the risk of price volatility—statements the Court must assume for purposes of this motion are captured accurately in Wehrenberg's contemporaneous notes—is "obviously

unimportant" to a reasonable investor. *Endo*, 863 F. Supp. at 717. To the contrary, the statements appear to be quite obviously material, not least because the securities lawyer who made them is claimed to have explicitly characterized the earnings report as material. Moreover, the first item on Federal Signal's list of events and topics typically regarded as material relates to "financial results"—i.e., earnings. A reasonable juror could find that Morris's discussion of Federal Signal's forthcoming earnings, which included a warning of stock price volatility, conveyed at least the outline of a significant corporate development, even if Morris did not spell out a particular projection.

The cases that Federal Signal cites to support its assertion that "[c]ourts routinely [hold] various indefinite statements . . . immaterial as a matter of law," Def. Mem. at 7 n.2, relate mostly to puffery in statements by corporate management to the public, for example, assurances that the defendant issuer was a "growing and prosperous company." *Fewell v. Kozak*, No. 98 C 2924, 1999 WL 966449, *5 (N.D. Ill. Oct. 19, 1999). This case is not about puffery. It concerns communications between a former top-level corporate officer and that corporation's agents, at least one of whom was concerned that the former officer might still be an insider for purposes of the federal securities laws.

Finally, Federal Signal's definition of material information as information that "provide[s] an 'indicated probability that [any] event will occur,'" is too narrow, particularly because Federal Signal appears to argue the definition is exhausted by the list of set of business, financial, and legal events described above. Def. Mem. at 8 (quoting *Basic v. Levinson*, 485 U.S. 224, 238 (1988) (brackets in Federal Signal's brief)). The passage in *Basic* that Federal Signal quotes—itself a quote from the Second Circuit's decision in *SEC v. Texas Gulf Sulfur*, 401 F.2d 833, 849 (2d Cir. 1968), incidentally—addresses "the materiality requirement of Rule 10b-5, with respect to contingent or speculative information or events," notably mergers. *Basic*, 485 U.S. at 238. *Basic*'s broader,

encompassing definition of materiality does not necessarily depend on some indication of the probability that an event from a finite set will occur. Rather, it requires "a substantial likelihood that a reasonable shareholder would consider [the information at issue] important" in making investment decisions. *Id.* at 231 (quoting *TSC Indus.*, 426 U.S. at 449).[3] For the reasons already given, the Court is not persuaded that, as a matter of law, no reasonable investor would consider the information given Wehrenberg important in making an investment decision. Federal Signal is not entitled to summary judgment on this ground.

### III.    Disclosure as a means of avoiding potential liability under section 10(b)

Finally, Federal Signal argues that, even if questions of material fact exist with regard to Wehrenberg's risk of insider-trading liability and the materiality of the information he received, Federal Signal is entitled to summary judgment because Wehrenberg could have avoided any risk of liability by disclosing to his former employer the information Wittig and Morris gave him along with his intent to trade. According to Federal Signal, Wehrenberg then would have been free to sell Federal Signal stock before the release of the earnings report and would not have incurred the loss he now claims.

Wehrenberg responds that disclosure to Federal Signal would not have had the legal effect Federal Signal says it would. Wehrenberg argues Federal Signal's reliance on *O'Hagan* reflects confusion about the "classical" and "misappropriation" theories of insider trading. Under the classical theory, which Wehrenberg asserts would have been the basis of the hypothetical case against him, a person in possession of material

---

[3] *Basic* adopted the *TSC Industries* definition of materiality, which concerned the proxy-solicitation context, for the section 10(b) and Rule 10b-5 context. *Basic*, 485 U.S. at 231-32. Thus, the *TSC Industries* test of a "substantial likelihood that a reasonable shareholder would consider [information] important in deciding how to vote" his or her proxy came to apply more broadly to investment decisions that could be the basis for an action under section 10(b) and Rule 10b-5. *Id.*

nonpublic information must, to avoid insider-trading liability, disclose it to the market as a whole or abstain from trading until it reaches the market in some other way. This, Wehrenberg contends, was something he had no effective way of doing. For that matter, Wehrenberg asserts, because was an insider who owed a duty to Federal Signal to keep the information confidential, he had no right to make such a disclosure to begin with.

The Court agrees with Wehrenberg. Federal Signal's argument that disclosure to the company would have eliminated all risk of insider trading liability does not hold up under scrutiny. Federal Signal draws on *O'Hagan*, a case that differs significantly from the hypothetical insider-trading case encompassed in Wehrenberg's breach of contract claim. In *O'Hagan*, the Supreme Court held that criminal liability under section 10(b) of the 1934 Act may be predicated on the misappropriation theory of insider trading. *O'Hagan*, 521 U.S. at 666. O'Hagan, a partner in a law firm that had been retained to help prepare a tender offer, bought up large numbers of the target's shares and call options before the offer was made public, then sold these at a substantial profit after his firm's client announced its plans. *Id.* at 647-48. The Court held that although an outsider in O'Hagan's position owed no fiduciary duty to the target firm's shareholders, section 10(b)'s requirement of a "deceptive device" could still be met because the outsider misappropriated confidential information in violation of a duty to its source (in *O'Hagan*, both the law firm and its client). *Id.* at 653-54. The Court also noted that

> [f]ull disclosure forecloses liability under the misappropriation theory: Because the deception essential to the misappropriation theory involves feigning fidelity to the sources of information, if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no "deceptive device" and thus no § 10(b) violation.

*Id.* at 655. Under the theory of misappropriation the Court addressed in *O'Hagan*, it is clear that the disclosure obligation runs only to the sources of the information, not to those with whom the misappropriator trades or the market as a whole. *Id.* at 655 n.6.

Misappropriation plays no role, however, in the hypothetical insider-trading prosecution on which Wehrenberg's claim hinges. Though it is open to question whether Wehrenberg was a Federal Signal insider in October 2004, he certainly was not an outsider as O'Hagan was with respect to the target of the tender offer. In addition, Wehrenberg did not obtain the information at issue in this case in violation of a duty to its source, as O'Hagan did. If anything, it appears that he came into the information as a result of circumspection on the part of Wittig and Morris, who were agents for the source. It follows that the mechanism for avoiding liability under the misappropriation theory—disclosure to the source of the intent to trade using the source's information—would not have helped Wehrenberg.

Moreover, Federal Signal's cavalier reply to Wehrenberg's argument that he would have had to disclose to the market the information he received—Federal Signal dismisses the need for "'market' disclosure, whatever that is," Def. Reply at 10—overlooks the key role that this disclosure plays in the "classical" insider trading context. "Proper and adequate disclosure of significant corporate developments can be effected by a public release through the appropriate public media, designed to achieve a broad dissemination to the investing public generally." *Dirks*, 463 U.S. at 653 n.12 (quoting *In re Faberge Inc.*, 45 S.E.C. 249, 256 (1973)). Although the Court is dubious about Wehrenberg's suggestion that the lack of a "cost-free" means of market disclosure has some bearing here, Pl. Mem. at 19, it has no doubt that market disclosure accurately describes one half of the duty to disclose or abstain in the classical insider trading context. *See id.* at 653 (citing *In re Cady, Roberts & Co.*, 40 S.E.C. 907, 912 (1961)).

*A propos* of the duty to abstain, the problem of Wehrenberg's possible duty of confidentiality to Federal Signal further weakens the company's position on this issue. Assuming for purposes of this motion for summary judgment, as the Court must, that Wehrenberg was a Federal Signal insider in October 2004, disclosure of the information

he received from Morris would have violated a duty not to disclose the company's confidential information. As a result, Wehrenberg's only choice was to abstain from trading until after the earnings report's release. See *United States v. Nacchio*, 519 F.3d 1140, 1156-57 (10th Cir. 2008) (citing *Cady, Roberts*, 40 S.E.C. at 911); see also LOUIS LOSS & JOEL SELIGMAN, FUNDAMENTALS OF SECURITIES REGULATION 944 (4th ed. 2004) ("since conflict is inevitable between the director's Rule 10b-5 duty to the other party to the transaction to disclose material facts and the common law duty he or she will often have to the company *not* to make premature disclosure, the director has no viable alternative but to abstain.").

For these reasons, Federal Signal is not entitled to summary judgment on the ground that Wehrenberg could have avoided potential insider-trading liability by disclosing his information before selling Federal Signal stock.

## CONCLUSION

For the reasons set forth above, the Court denies Federal Signal's motion for summary judgment [docket no. 174].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 29, 2008