# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KIM WEHRENBERG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 06 C 487 |
| | ) |
| FEDERAL SIGNAL CORP., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

This breach of contract suit is set for trial on Monday, June 16, 2008. In this decision, the Court decides certain issues addressed at the final pretrial conference on June 11, 2008 which have been the subject of further briefing.

## I. Interpretation of "full access" provision of contract

The parties dispute whether the Court should instruct the jury as to the meaning of the contractual term on which Wehrenberg's claim hinges: "full access" to the funds held on his behalf by Federal Signal in the "Rabbi Trust," under paragraph 3.6 of his Separation Agreement with Federal Signal. For the reasons set out below, the Court determines that (1) the Separation Agreement is clear on its face, such that its interpretation is properly the role of the Court as a matter of law; (2) contrary to Federal Signal's argument that "full access" must be read to mean access pursuant to the terms of the company's employee-benefit plan, the contract's plain language imposes no such qualification; and (3) the Court will instruct the jury that "full access" means that

Wehrenberg had immediate and unimpeded access to the funds held on his behalf in the "Rabbi Trust" as of September 1, 2004, which the parties agree is the "Separation Date" as contemplated by the contract.

Under Illinois law, which governs under paragraph 12 of the Separation Agreement, "contracts are interpreted according to the 'four corners' rule: an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined by the language used. It is not to be changed by extrinsic evidence." *Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 992-93 (7th Cir. 2007) (quoting *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 878 (7th Cir. 2005)) (alterations and internal quotation marks omitted). The Court looks first to the contract's language—and only to that language. *Id.* at 993 (citing *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462, 706 N.E.2d 882, 884 (1999)). If that language is free of ambiguity, the Court interprets the contract's terms with reference to their plain meanings (unless otherwise defined) and does not draw on extrinsic evidence. *Id.* (citing *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004)); *see also LaSalle Nat'l Trust, N.A. v. ECM Motor Co.*, 76 F.3d 140, 144-45 (7th Cir. 1996) (citing *La Throp v. Bell Fed. Savings & Loan Ass'n*, 68 Ill. 2d 375, 370 N.E.2d 188 (1977)) (interpretation of unambiguous contract is for the court). Ambiguity is present when the contract language is susceptible to more than one interpretation. *Camico Mut. Ins.*, 474 F.3d at 993 (citing *Air Safety, Inc.*, 185 Ill. 2d at 462-63, 706 N.E.2d at 884); *see also Pioneer Trust and Sav. Bank v. Lucky Stores, Inc.*, 414 N.E.2d 1152, 1154, 91 Ill. App. 3d 573, 575 (citing *First Nat'l Bank v. Victor Comptometer*

*Corp.*, 123 Ill. App. 2d 335, 341, 260 N.E.2d 99, 102 (1970)). "If . . . the court concludes that the contract is ambiguous, the resolution of the ambiguity becomes a question of fact, to be decided by the trier of fact." *LaSalle Nat'l Trust*, 76 F.3d at 145 (citing *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447, 581 N.E.2d 664, 667 (1991)).

With regard to the first step of "four corners" analysis, Federal Signal argues that paragraph 3.6 of the Separation Agreement is unambiguous: "the plain meaning is that Plaintiff is entitled to receive his stock in the Rabbi Trust pursuant to the terms of the Plan." Def. Br. at 5. The Court disagrees. Paragraph 3.6 of the separation agreement reads in full as follows:

> 3.6 **Other Benefits**. WEHRENBERG shall be entitled to all vested rights and benefits under FEDERAL'S other employee benefit plans in accordance with their terms.
>
> Additionally, as of the Separation Date, he shall have full access to the funds which are held on his behalf under a Federal Signal Corporation Rabbi Trust.

The plain meaning of paragraph 3.6 is not, as Federal Signal contends, that Wehrenberg could obtain the Rabbi Trust funds in accordance with the terms of Federal Signal's employee benefit plans, specifically its 401(k) plan. Federal Signal correctly points out that the Rabbi Trust, also called the Supplemental Savings Plan, incorporates by reference Federal Signal's 401(k) employee benefit plan and gives the Supplemental Savings Plan's administrator the same powers with respect to the Rabbi Trust as it does with respect to the 401(k) plan. Federal Signal contends that the 401(k) plan's provisions for distributions to beneficiaries require a written request to the administrator on a form the administrator provides and give the administrator 30 days to

3

respond to the request as well as the discretion to make in-kind distributions rather than cash distributions. Federal Signal argues that these provisions likewise define what "full access" to the Rabbi Trust funds means under paragraph 3.6.

The problem with this analysis is that the plain language of section 3.6 treats Wehrenberg's entitlements to rights and benefits under the other employee benefit plans in one way—in accordance with those plans' terms—but marks out, using distinct language, a different approach to the funds held on Wehrenberg's behalf in the Rabbi Trust. First, the word "additionally" begins the sentence concerning the Rabbi Trust, marking a shift from the previous sentence and the beginning of a discrete, independent idea. Second, the two sentences use distinct verbs and modifiers to describe what Wehrenberg gets: in the first, he is entitled to benefits under those plans "in accordance with" plan terms; in the second, he has "full access" to the Rabbi Trust funds, with the only modifying clause relating to the Separation Date. This last point is particularly significant. As Federal Signal argues, the plan terms on which it relies set out various time frames in which requests for distributions may be satisfied; thus, the timing of Wehrenberg's entitlements as set out in the first sentence depends implicitly on those terms. In contrast, the second sentence sets up its own, explicit timing regime: full access as of the Separation Date. Finally, an additional terminological difference divides the first from the second sentences and suggests that the terms of Federal Signal's employee benefit plans do not inform the meaning of "full access." Specifically, Wehrenberg is entitled to *rights and benefits* under the benefit plans but is meant to have access to *funds* held for him in the Rabbi trust.

In sum, Federal Signal is mistaken about the plain meaning of section 3.6. But it

is correct when it notes that, because the contract language on which the parties' dispute turns is unambiguous when read for its plain meaning, the contract's interpretation is properly the role of the Court. The meaning of paragraph 3.6, according to the plain meaning of the language used therein, is not susceptible to more than one interpretation. *See Pioneer Trust, Inc.*, 414 N.E.2d at 1154, 91 Ill. App. 3d at 575. As the Court's rejection of Federal Signal's proffered interpretation demonstrates, the provision for "full access" to the Rabbi Trust funds does not come with qualifications—in contrast to the entitlement to rights and benefits under Federal Signal's other plans. The only modifier of "access" is "full," meaning plenary and thus, in the context of access, unimpeded to any degree. "As of the Separation Date" means that this plenary access is immediate, rather than gradual or phased over some series of dates or other benchmarks. Accordingly, the Court will instruct the jury at trial that "full access" means that Wehrenberg was entitled to have immediate and unimpeded access to the assets held on his behalf in the Rabbi trust as of the Separation Date.

## II. Materiality standard and Wehrenberg's proposed testimony

Wehrenberg's primary theory of liability is that Federal Signal did not give him "full access" to the funds in the Rabbi Trust because it determined unilaterally to distribute those funds to him in the form of Federal Signal stock and then imposed what his counsel characterizes as the equivalent of a restrictive endorsement, by telling him that Federal Signal was about to issue a quarterly earnings report that would be material and would affect the price of the stock. This, Wehrenberg argues, effectively precluded him from selling the stock, out of fear that he would face liability for insider trading in violation of the federal securities laws. As a result, he says, he was forced to

hold the stock until after the earnings report was made public. Once that happened, the stock price dropped, and Wehrenberg lost money he would have made had he been able to sell the stock sooner or had Federal Signal distributed the Rabbi Trust funds in cash.

Both sides agree, and have proposed in draft jury instructions, that the jury should be instructed on certain aspects of insider trading law so that it can determine whether Wehrenberg has proven a breach of the "full access" clause. They dispute, however, the particulars of these instructions. In a somewhat related dispute, concerning three motions *in limine* filed by Federal Signal, the parties contest whether Wehrenberg should be able to testify regarding his understanding of written communications that he received from Paul Wittig, a Federal Signal employee, and from David Morris, an outside attorney for Federal Signal, regarding his request for a distribution of his Rabbi Trust funds. To some extent, the legal issue underlying these disputes concerns how materiality is determined for purposes of the federal securities laws and specifically for SEC Rule 10b-5, the rule under which Wehrenberg allegedly feared liability for insider trading.

As the Supreme Court held in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976), "[t]he question of materiality, it is universally agreed, is an objective one." *Id.* at 445; *see also Basic v. Levinson*, 485 U.S. 224, 240 (1988) ("materiality depends on the significance a reasonable investor would place on the . . . information" at issue); *Flamm v. Eberstadt*, 814 F2d 1169, 1178 (7th Cir. 1987) (citing *TSC Indus.*, 426 U.S. at 445); *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 413 (5th Cir. 2001) (quoting *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1117-18 (5th Cir. 1988) ("the element of reliance is

the subjective counterpart of materiality [in Rule 10b-5 actions]. Whereas materiality requires the plaintiff to demonstrate how a 'reasonable' investor would have viewed the defendants' statements and omissions, reliance requires a plaintiff to prove it actually based its decisions on the defendants' misstatements or omissions."). Thus, materiality is an objective standard that

> contemplate[s] . . . a showing of substantial likelihood that, under all the circumstances, the omitted fact [or other information at issue] would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available [about the issuer].

*TSC Indus.*, 426 U.S. at 449.

Wehrenberg argues that the materiality analysis accounts for the shareholder's particular circumstances and knowledge, relying on *Michaels v. Michaels*, 767 F.2d 1185 (7th Cir. 1985). *Michaels* does not, as Wehrenberg contends, inject subjectivity into the materiality analysis. Rather, it interprets the "total mix of information" and "under all the circumstances" aspects of the *TSC Industries* analysis, and this only from the perspective of the shareholder as shareholder.

The court in *Michaels*, which concerned omissions by two of three shareholders in a closely held corporation to the third, minority owner about the prospects for a buyout, acknowledged *TSC Industries*' teaching that "the test of materiality is always an objective one." *Id.* at 1196. But the court added that "[e]ven with the objective test, . . . the fact that the corporation [whose shares were traded in the transaction at issue] is small and closely held may affect the materiality of an omitted fact" because "the 'total mix' of information available to the reasonable shareholder includes the probability of

7

being locked into a minority interest of an unprofitable, closely-held corporation." *Id.* at 1196-97. Thus, the Seventh Circuit's statement that the objective reasonable shareholder's view of a given piece of information "depends on the circumstances confronting him," *id.* at 1197, depends precisely and only on his circumstances *as a holder of the security in question*. As the court concluded with respect to how it would analyze the materiality of the omissions in *Michaels*, "[w]e therefore must consider whether the withheld information . . . would have assumed actual significance in the deliberations of the reasonable shareholder *owning such a minority interest*." *Id.*; *see also Kademian v. Ladish Co.*, 792 F.2d 614, 623 (7th Cir. 1986) (citing *Michaels*, 767 F.2d at 1196) (reasonable shareholder standard for materiality "is an objective standard but one that requires an examination of the 'total mix' of information available to the shareholders in a given case.").

Other caselaw concerning materiality and insiders, however, offers more support for Wehrenberg's position. In *SEC v. Happ*, 392 F.3d 12 (1st Cir. 2004), the defendant, a director of a company called Galileo, was sued for insider trading because he sold Galileo stock after allegedly learning negative financial information that had not yet been made public. The defendant argued that he had received only voice mail messages from Galileo's CEO saying that the company was having "some difficulties during the quarter" and that this information was too vague or cryptic to be material. The court disagreed. It noted that the defendant "was a financial expert and had closely followed the affairs of Galileo. The jury could therefore find him capable of drawing reasonable inferences from [the] messages." *Id.* at 21-22. The court also relied on other information the defendant had obtained that put into context the

messages about "difficulties." *Id.* at 22. It concluded that a jury reasonably could find that the defendant "inferred from the voice mail messages that Galileo faced significant financial problems affecting its third quarter, and that this information altered significantly the 'total mix' of information available to a reasonable investor in his posture"–in other words, that it was material. *Id.* at 23. Thus, the analysis of what constitutes material information, particularly in the case of communications between corporate insiders, may draw on their background knowledge to capture precisely what was information was conveyed.

In this connection, Wehrenberg argues that the evidence that Federal Signal's motions *in limine* seek to exclude—testimony about what Wehrenberg understood the earnings-related communications to mean and what Federal Signal knew about its own forthcoming earnings—is also admissible for another purpose. Specifically, he argues it should come in to establish precisely what was conveyed by what Wittig and Morris told him.

It is not unusual to permit a witness to explain how he understood a communication from someone else, particularly when the communication was not in common, everyday language or was otherwise cryptic. One example of this concerns drug dealers' code-worded conversations with their customers and suppliers. It is routine to allow participants in such conversations to explain their understanding of what was said. Wittig's somewhat cryptic e-mail and Morris's securities-lawyer-speak letter to Wehrenberg would appear to fit within the category of communications whose understood import appropriately can be the subject of testimony by the recipient of the communication.

As a general rule, however, testimony about how someone understood a communication he received is admissible only if his understanding is relevant, a basic requirement for the admissibility of any evidence. *See* Fed. R. Evid. 402. In arguing that he should be allowed to testify about his understanding of Morris's letter and Wittig's earlier e-mail, Wehrenberg says that he needs to explain his understanding because the e-mail and letter "are cryptic." Pl. Mem. at 2. He says that he understood the communications in a particular way because of his background with Federal Signal and his knowledge, as a lawyer, regarding the underlying information Wittig and Morris appeared to be conveying.

The problem with this, Federal Signal argues, is that it allows Wehrenberg to evade the objective standard for materiality. Wehrenberg's theory is that though these cryptic written communications likely would tell the average shareholder nothing, they spoke volumes to him because of his own knowledge and background.[1] Federal Signal focuses on the text of the communications and argues that it could not possibly have been material under the "reasonable investor" standard. Specifically, Federal Signal contends, a statement that the timing of a request for a Rabbi Trust distribution required consultation with outside counsel and a statement that the request was "complicated by timing considerations . . . related to the Federal securities laws" would tell the "reasonable shareholder" of *TSC Industries* and the "reasonable investor" of *Basic* nothing of consequence. Federal Signal argues that because allowing Wehrenberg to give his understanding of the e-mail and letter would effectively transmogrify the

---

[1] The Court notes that Wehrenberg says that after getting the e-mail and letter, he called Morris, essentially to ask what Morris meant, and that Morris made a very pointed reference to an impending and material earnings announcement that would affect the stock price.

materiality standard into one determined not by reference to a hypothetical reasonable investor, but by reference to a person with the particular knowledge and expertise of the plaintiff.

The Court disagrees. Federal Signal's argument elides the distinction between two distinct questions: what information was conveyed, and whether that information was material. Wehrenberg's understanding of what he was being told bears on the first question. To determine what information Wehrenberg had that might implicate the possibility of insider trading liability, it is appropriate to allow him to describe how he understood the information.[2]

In this regard, the First Circuit's decision in *Happ* is instructive. The jury's finding against the defendant in *Happ* was upheld based essentially on the same theory of liability that Wehrenberg said he feared and that, as a result, prevented him from realizing the value of his Rabbi Trust assets. Specifically, Federal Signal's representatives gave him information that a person on the street might have found cryptic but which he understood (and, he argues, Federal Signal likely knew he understood) due to his background and knowledge. Wehrenberg's testimony regarding how he understood that information is therefore relevant, and it is not, contrary to Federal Signal's argument, expert testimony subject to Rule 702. Finally, Wehrenberg's testimony is not unfairly prejudicial such that it should be excluded under Federal Rule of Evidence 403; the Court is unpersuaded by Federal Signal's argument that the jury will be confused or misled by this testimony.

---

[2] Such testimony is also relevant as background for the alleged conversation referenced in footnote 1 *supra*, which was, according to Wehrenberg, not in the least bit cryptic.

For these reasons, the Court denies Federal Signal's motion *in limine* 5, in which it seeks to preclude Wehrenberg from providing his understanding of the Wittig e-mail and the Morris letter.

Federal Signal seeks by way of separate motions (motions *in limine* 6 and 7) to preclude Wehrenberg's counsel from asking Wittig and Morris what material, nonpublic information they had when they wrote the communications at issue and from introducing evidence about what material, nonpublic information Federal Signal had at the time. Federal Signal argues that Wehrenberg's claim turns on what he was told and that what Wittig and Morris (or others at Federal Signal) knew at the time has no bearing on what information was given to him. Wehrenberg argues that what the speakers knew has a bearing on what they intended to convey and did convey.

The Court agrees with Wehrenberg that this evidence is relevant and admissible. This is so not just for the primary reason Wehrenberg has argued—noted in the preceding paragraph—but also for a second reason. The information that Wittig, Morris, and Federal Signal had is relevant because it tends to explain why they acted as they did, in particular in declining to liquidate the stock in the Rabbi Trust and give Wehrenberg cash (contrary to what Wehrenberg contends had been the common practice in earlier distributions to others). Though intent, as such, is not an element of a claim for breach of contract, that does not render irrelevant evidence tending to show why the defendant allegedly breached the contract, at least to the extent it illuminates the plaintiff's theory of liability, which certainly is the case here. And though Federal Signal argues that the evidence also should be excluded under Rule 403, it provides no

good explanation for why the evidence would be unfairly prejudicial or in the least bit confusing.

For those reasons, the Court denies Federal Signal's motions *in limine* numbers 6 and 7.

**Conclusion**

For the reasons stated above, the Court denies defendant's motions *in limine* 5, 6 and 7. The Court will likewise incorporate its determinations regarding the definition of the "full access" contract term and to the standard for materiality under the securities laws into its instructions to the jury in this case.

                                                                            _____
                                                                  MATTHEW F. KENNELLY
                                                                  United States District Judge

Date: June 13, 2008